**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

OPENCLINICA, LLC,
      Plaintiff,

        v.               No. 24-cv-11555-DLC

EVIDILYA, S.R.L.,
        Defendant.

**MEMORANDUM AND ORDER ON DIVERSITY JURISDICTION**

**CABELL, U.S.M.J.**

In this breach of contract dispute based on diversity jurisdiction, plaintiff OpenClinica, LLC, a company that licenses software and provides related services to conduct clinical trials, alleges that defendant Evidilya, S.R.L., an Italian company which coordinates clinical studies, breached a Master Subscription Agreement (the Master Agreement). In a prior filing, defendant asserted that a limitation of liability provision (LOL) in the Master Agreement raised doubts regarding the existence of diversity jurisdiction anent the $75,000 threshold.[1] As instructed, the parties submitted briefs on the matter and the issue is therefore ripe for review. For the reasons that follow,

---

[1] In that regard, the LOL limits defendant's aggregate liability (and therefore plaintiff's recovery) to the amount of fees paid and payable to plaintiff by defendant during a twelve-month period prior to the time the claim arose.

plaintiff satisfies its burden to establish the amount-in-controversy requirement.

## I.   <u>**LEGAL STANDARD**</u>

"The party invoking diversity jurisdiction bears the burden of establishing that the amount-in-controversy requirement is satisfied." *Andersen v. Vagaro, Inc.*, 57 F.4th 11, 14 (1st Cir. 2023). Ordinarily, the amount is determined "from the complaint itself, unless it appears or is [demonstrated] that the amount stated . . . is not claimed in good faith." *Horton v. Liberty Mut. Ins., Co.*, 367 U.S. 348, 353 (1961); *Kersey v. Peoples' United Bank, N.A. of Ct.*, No. 16-cv-12414-PBS, 2017 WL 8730466, at *3 (D. Mass. Nov. 7, 2017) (quoting *Horton*, 367 U.S. at 353, in parenthetical). "[W]hen challenged," however, "the plaintiff 'has the burden of alleging with sufficient particularity facts indicating that it is not a legal certainty that the claim involves less than the jurisdictional amount.'" *Andersen*, 57 F.4th at 15 (citations omitted); *Id.* ("[P]laintiff, when challenged, must provide 'competent proof' supporting jurisdictional claim" (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)) (additional citation omitted). In meeting that burden, the plaintiff should provide "additional documentation, such as affidavits" or other competent proof. *Id.* (citations omitted).

## II.  BACKGROUND[2]

In October 2021, plaintiff and defendant entered into the Master Agreement.  As stated therein, plaintiff agreed to provide defendant with "Subscription Services" for clinical research studies carried out by defendant.  (D. 30-1) (Master Agreement stating "OpenClinica will provide [defendant] with Subscription Services for Subscriber Studies . . . ."); (D. 30-1) (Master Agreement defining "Subscription Services" as those set out in an order form); (D. 30-1) (Master Agreement defining "Subscriber's Studies" as "clinical research studies carried out by Subscriber," i.e., defendant).  Defendant, in turn, agreed to pay plaintiff the fees stated in an order form in accordance with the schedule in the form.  (D. 30-1) (Master Agreement stating "Subscriber," i.e., defendant, will pay OpenClinica fees as stated on the Order Form . . . in accordance with the payment schedule set forth on the Order Form . . . .").

At the time the parties executed the Master Agreement they entered into their first order form.  (D. 30, ¶ 4) (D. 30-2).  The October 2021 order form set out a thirty-six month term during which plaintiff allowed defendant to use two of its software products for $3,500 per month.[3]  (D. 30-2, p. 2) (D. 30, ¶ 4).  As

---

[2] The background is culled from additional documentation as opposed to the complaint.

[3] The order form also allowed defendant to use two more software products for twenty-four months.

stated in the order form, plaintiff would bill defendant annually for these subscription services.  In practice, the parties changed the annual billing to monthly billing at defendant's request.  (D. 30, ¶ 6).

Defendant's payment was due within thirty days of the date of an invoice.  (D. 30-2).  Further, defendant incurred a 1.5% late fee on past due amounts pending more than thirty days.  (D. 30-2, p. 4) (D. 30, ¶ 5).  Defendant failed to pay at least a dozen invoices in a timely manner, if at all.  (D. 30-4).

In February 2023, and with the parties still operating under the October 2021 order form because of the thirty-six month term, the parties entered into another order form involving a second research study carried out by defendant.  (D. 30, ¶ 8).  Like the October 2021 order form, the February 2023 order form imposed a 1.5% late fee if defendant failed to pay an invoice within thirty days.  (D. 30-3).  The form set out a quarterly billing structure. (D. 30-3) (order form stating "Subscription items billed quarterly in advance"); (D. 30, ¶ 10).  At defendant's request, however, plaintiff billed defendant on a monthly basis.[4]  (D. 30, ¶ 9).

The start date for the services in the February 2023 order form was January 2, 2023.  (D. 30-3) (D. 30, ¶ 8).  To continue, from December 2022 to August 2023 plaintiff sent defendant eight

---

[4] The monthly invoice corresponded to a three-month period.  (D. 30, ¶ 10).

invoices which remain unpaid.  The invoiced amount totals $52,109 excluding late fees.  (D. 30-4).  From August to October 2023, plaintiff issued defendant four more invoices which also remain unpaid.  These invoices total $24,030 yielding a total amount of $76,139 for the December 2022 to October 2023 period.  Late fees for the foregoing unpaid fees total $2,833.50 up to October 2023. (D. 30-4).  In late December 2023, plaintiff sent defendant three more invoices which remain unpaid.  These invoices totaled $15,250 and remain unpaid.  (D. 30-4).

## III.  DISCUSSION

As previously noted, the LOL limits defendant's liability (and therefore plaintiff's recovery) to the amount of fees paid and payable to plaintiff during a twelve-month period.  As such, the LOL plays a critical role in assessing the $75,000 amount-in-controversy requirement.  In pertinent part, the LOL reads as follows:

> The total aggregate liability of either party . . . for any claims or causes of action arising under [the Master Agreement] will not exceed the aggregate amount of the fees[5] paid and payable to OpenClinica by [defendant] during the twelve (12) month period preceding the date *on which the claim arises*.

(D. 23) (emphasis added).  The parties dispute when the breach of the Master Agreement claim arose and the applicable twelve-month

---

[5] The term "fees" means the "fees as stated on the Order Form . . . ."  (D. 30-1, p. 4).

lookback period.[6]   (D. 29) (plaintiff's brief surmising that contract claim arose in October 2023 warranting October 2022 to October 2023 lookback period); (D. 33) (defendant's brief asserting claim arose in August 2023 warranting August 2022 to August 2023 lookback period).[7]   The court therefore addresses the meaning of when "the claim arises."   Thereafter, the court identifies the twelve-month lookback period and calculates the jurisdictional amount.

A.   **WHEN THE CLAIM ARISES**

As noted, the LOL limits the recoverable fees to the twelve-month period preceding "the date on which the claim arises."   (D. 30-1, p. 8).   Plaintiff maintains this language is ambiguous.   (D. 29, pp. 4-5).   As discussed below, it is not.

---

[6] The three-count complaint sets out three causes of action:   breach of the Master Agreement, quantum meruit, and promissory estoppel.   Aligning with the parties' argument, the court focuses on the breach of contract claim.   *See generally Klauber v. VMware, Inc.*, 80 F.4th 1, 15 (1st Cir. 2023) (Quantum meruit claim does not provide "an available avenue of recovery when a valid contract governs the parties' obligations.") (citations omitted); *Bosque v. Wells Fargo Bank, N.A.*, 762 F. Supp. 2d 342, 353 (D. Mass. 2011) (Promissory estoppel provides "an alternative theory of recovery for a contract that is not supported by consideration.").

[7] Defendant cites only an August 2023 email to support that the breach of contract claim falls short of the $75,000 amount-in-controversy requirement. (D. 33-1) (D. 33, pp. 3, 5-10).   Having fully reviewed the email, it does not change the result, to wit, plaintiff satisfied its burden to establish the $75,000 threshold.

Separately, the parties' construction of the term "claim" as synonymous with the breach of the Master Agreement claim is misguided.   As discussed infra, "claim" means a right to payment.   Hence, the parties' dispute regarding the breach of contract "claim" as arising at the time of the breach (in August per defendant and in October 2023 per plaintiff) is not the relevant guidepost.

To begin, a choice-of-law clause in the Master Agreement dictates the application of Massachusetts law to the LOL.  (D. 30-1) (Master Agreement stating, "This Agreement . . . will be governed by and construed in accordance with the laws of the Commonwealth of Massachusetts . . . .").   When diversity jurisdiction exists, the law of the forum (Massachusetts) "sets the rules for which state's law decides the enforceability" of a choice of law clause.  *DraftKings Inc. v. Hermalyn*, 118 F.4th 416, 419 (1st Cir. 2024).   In that regard, "Massachusetts usually respects the parties' choice of law."  *Id.* (citations omitted); *see Alaniz v. Bay Promo, LLC*, 143 F.4th 18, 32 n.14 (1st Cir. 2025) (noting "district court, applying Massachusetts law, gave effect to the choice of law provision of the contract" and "find[ing] no reason to disrupt the district court's ruling").

Massachusetts contract law is straightforward.   "'[W]hen contract language is unambiguous,'" it is "'construed according to its plain meaning.'"  *Hovagimian v. Concert Blue Hill, LLC*, 172 N.E.3d 728, 735 (Mass. 2021) (quoting *A.L. Prime Energy Consultant, Inc. v. Mass. Bay Transp. Auth.*, 95 N.E.3d 547, 558 (Mass. 2018)); *accord Artuso v. Vertex Pharms., Inc.*, 637 F.3d 1, 6 (1st Cir. 2011) (absent ambiguity, contract's terms are "construed, and enforced as written") (applying Massachusetts law) (citation omitted).   Thus, where "the words of a contract are clear," they are construed "according to their plain meaning, in the context of

the contract as a whole." *Lieber v. President and Fellows of Harvard Coll.*, 179 N.E.3d 19, 26 (Mass. 2022) (citations omitted). To ascertain the meaning of a term or phrase, it is permissible to consider dictionary definitions. *See Dorchester Mut. Ins. Co. v. Krusell*, 150 N.E.3d 731, 738-739 (Mass. 2020) (using dictionary definition of "physical" to find the term unambiguous) (citation omitted); *accord Talvitie v. Talvitie*, 23-P-917, 2024 WL 4498925, at *3 (Mass. App. Ct. Oct. 16, 2024) ("established dictionaries can furnish the approved natural meaning of disputed terms" (citing *Suffolk Constr. Co. v. Illinois. Union Ins. Co.*, 951 N.E.2d 944, 948 (Mass. App. Ct. 2011)).

Contract "language is ambiguous when it 'can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken.'" *Balles v. Babcock Power Inc.*, 70 N.E.3d 905, 911 (Mass. 2017) (citation omitted); *accord North America Photon Infotech, Ltd. v. Acquia, Inc.*, 795 F. Supp. 3d 125, 135 (D. Mass. 2025) (stating contract terms ambiguous "when they 'are inconsistent on their face or where the phraseology can support reasonable difference of opinion as to the meaning of the words employed'") (applying Massachusetts law) (citation omitted), *appeal docketed*, No. 26-10 (1st Cir. Jan. 14, 2026).

First and foremost, the term "arise" commonly means to begin to exist or come into being. *See Arise*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary (last

8

visited Apr. 10, 2026); *see also Green v. Travelers Ins. Co.*, No. 98-P-2169, 2001 WL 214126, at *1 (Mass. App. Ct. Mar. 5, 2001) ("[P]hrase 'arising out of' is synonymous with 'originate' or 'come into being.'").  Per the language of the LOL, the term "claim" is not synonymous with a cause of action.  If it was, the LOL's language "claims or causes of action" would render the latter phrase superfluous.  *See NTV Mgmt. Inc. v. Lightship Global Ventures, LLC*, 140 N.E.3d 436, 443 (Mass. 2020) (construing "contract as a whole, so as to give reasonable effect to each of its provisions") (internal quotation marks and citation omitted); *Strand v. Herrick & Smith*, 489 N.E.2d 179, 182 (Mass. 1986) (letter "construed to give reasonable effect to each of its terms, so as not to render any provision superfluous").  Turning again to the dictionary, the term "claim" connotes "[t]he assertion of an existing right" such as a "right to payment . . . ." *Claim*, Black's Law Dictionary (12th ed. 2024).  Taken together, "the date on which the claim arises" means the date when the assertion of the right to payment (a "claim") begins to exist ("arises"). Stated more concretely, plaintiff first asserted the existing right to payment via the invoices at issue.[8] *See* (D. 30-4) (listing invoices with dates from December 28, 2022 to December 29, 2023).

---

[8] The documentation in the record does not include assertions of the right to payment before (as opposed to after) the invoices.  As an aside, the August 11 email chain includes the February 23, March 28, April 10, June 28, June 29, and July 10, 2023 invoices.  (D. 33-1).  The March 28, April 10, and June 29 invoices set out slightly higher amounts than the corresponding amounts in the chart

B.    **TWELVE-MONTH PERIOD AND CALCULATION OF AMOUNT**

Next, the LOL's larger phrase states that "any claims . . . will not exceed the aggregate amount of the fees paid and payable to" plaintiff by defendant "during the twelve (12) month period preceding the date on which the claim arises."  (D. 30-1).  The date of the first invoice is December 28, 2022, and the date of the last invoice is December 23, 2023, i.e., one day longer than twelve months.  (D. 30-4).  The date of the invoice preceding the December 23 invoice is October 10, 2023.  The invoiced amounts during the December 28, 2022 through October 10, 2023 period total $76,220.[9]  (D. 30-4).  As such, it is not a legal certainty that the claim for diversity jurisdiction involves less than the $75,000 jurisdictional amount.

IV.   **CONCLUSION**

In accordance with the foregoing discussion, the $75,000 jurisdictional amount-in-controversy is satisfied.

/s/ Donald L. Cabell
DONALD L. CABELL, U.S.M.J.


DATED:  April 16, 2026

---

attached to the affidavit of plaintiff's Vice President of Finance.  (D. 30-4).  The other invoices reflect the same amounts in the chart.  Consequently, the discrepancy only increases the jurisdictional amount calculated in the next subsection.

[9] The $76,220 is calculated by adding the amounts of the invoices ($12,900, $16,130, $17,280, $24,030, and $5,880) for this period set out in the chart. (D. 30-4).